MOISE, Justice.
 

 The defendant, Mrs. Cola Spillman Leming, charged in a bill of indictment with the murder of Mamie Furr, was tried, convicted as charged, without capital punishment, and sentenced “to the Louisiana State Penitentiary at hard labor for the remainder of her natural life.” From this conviction and sentence she has appealed to this Court, and for reversal thereof, relies on thirty-six bills of exception. Thirty-four of these bills were reserved to alleged errors committed during the course of the trial and two further bills, to the overruling of defendant’s application for a new trial and her motion in arrest of judgment.
 

 The record reveals that the defendant and decedent were neighbors, defendant residing with her husband and two daughters next to the house in which decedent resided with her husband and her three sons. About three months prior to decedent’s death, defendant and the husband of the deceased had left their respective homes and lived in New Orleans as man and wife, returning to Bogalusa in the early part of January, 1949. On the morning of January 25, 1949, decedent left her home for work at the box plant where she had been employed for several years. She returned to her home around noon and soon thereafter she was invited by the defendant to drink coffee at defendant’s home, and was seen by neighbors drinking coffee while seated on ,the top step of the back porch of defendant’s home. Immediately after the deceased returned to her own dwelling, she was stricken with violent stomach pains, accompanied by severe retching and vomiting" of blood. She called another neighbor and told her of drinking the coffee at defendant’s house and asked her to go for assistance. Deceased was heard to moan in her agony, “Oh, Dinah (defendant’s nickname) what did you do to me?” She was rushed to the hospital and died within an hour. Shortly after defendant learned of decedent’s death, she was seen by a neighbor in a rocking chair on the back porch of her home with her head in her hands, repeating “My God, what have I done? * * * ”
 

 Several hours after the decedent’s death, her stomach, ■ its contents, the liver and other organs of deceased were removed by the Parish Coroner; they were packed in ice and taken by two officers to the State Board of Health Chemical Laboratory in New Orleans, where they were delivered to the State Chemist. An analysis showed
 
 *275
 
 that the organs and stomach contents contained a water soluble fluoride, classified as a deadly corrosive poison. Other chemical analyses were made of coffee stains found on the table cloth in use in defendant’s home on January 25, 1949, and it was proved by tests that these stains contained the same type of poison as was found in deceased’s organs. On February 2, 1949, the Grand Jury of Washington Parish returned an indictment, charging defendant with the murder of deceased.
 

 There is contained in this record a Per Curiam written by the trial judge, in which "he has fully set forth and has most comprehensively analyzed all of the thirty-six bills of exception herein taken, and has amply supported
 
 his
 
 reasonings and rulings with appropriate authorities. After a careful consideration of the record and a study of the law involved, we are convinced that the trial judge has, with profound understanding, correctly disposed of all of the complaints in this case. Therefore, being in full accord with the findings and rulings of the trial judge, we quote from his Per Curiam, adopting the views therein expressed as our own:
 

 “I have signed all the Bills of Exceptions presented to me for the reason I considered it my mandatory duty to do so under the provisions of Article 499 of the Code of Criminal Procedure. However, there are instances where the recital of the facts in certain bills do not correspond with the testimony taken in connection with said bills. In such a situation the testimony as taken down prevails over the statement of facts recited in the bill. See State v. Brantley, 169 La. 315, 125 So. 257. I will, therefore, point out these variances in my treatment of the various Bills of Exceptions.
 

 “On
 
 February 8, 1949, Ott & Richardson, who were then the attorneys for defendant, filed a rule against the State of Louisiana requiring the Coroner of Washington Parish and the District Attorney to show cause why the report of the State Board of Health as to its findings in connection with the autopsy held of the deceased should not be filed in the office of the Clerk of Court. Counsel further sought to have the defendant in rule file in the office of the Clerk of Court all exhibits, physical evidence and documents in their possession or under their control which was intended to be used by them as evidence by the State in the trial. The rule was heard on February 9, 1949, and the minutes reflect that after testimony was heard the Court ordered that the record show that Dr. R. R. Ward, the Coroner, filed the partial report of the State Board of Health in the office of the Clerk of the Court. It was further shown by the evidence that this was the only report the State had at that time. The minutes further reflect that by consent of counsel for defense the Court over-ruled the motion for the rule, since the State had complied with the essential requirements of the rule. As a matter of fact, Ott & Richardson stated in
 
 *277
 
 open Court that they realized that they were not entitled to all the exhibits, physical evidence and other matters which the State had intended to use as evidence in the case, and that they further realized said exhibits would not have to be filed, in the office of the Clerk of Court. They not only did not except to the ruling which dismissed their rule, but consented to same. Therefore, Bill of Exception No. 1, which is based on the proposition that I failed to order the exhibits physical evidence and other matters to be filed in the office of the Clerk of the Court is without merit. Out of fairness to counsel for defendant, Mr. Ponder, he was not the attorney for the defendant at that time, so consequently might not'have understood my ruling in dismissing the rule to show cause why the physical evidence and exhibits should not be filed in the office of the Clerk of Court.
 

 “Bill of Exception No. 2 was taken to the refusal of the Court to grant to this defendant a preliminary hearing. The first application that was presented to me for my signature in regard to a preliminary hearing was the one presented by Mr. Ponder on March 8, 1949. Since the Grand Jury of Washington Parish had, more than a month prior to presentation of the petition for a preliminary hearing, returned an Indictment for murder against this defendant, I accordingly, and in the exercise of what I considered a sound discretion, refused to grant said preliminary hearing. Article 154 of the Code of Criminal Procedure provides that either the State or defendant shall have the right tO' demand a preliminary examination, but that after an indictment is found or an information filed it is wholly within the discretion of the District Court, and not subject to review by any other Court, to order or to refuse to order a preliminary examination. See also cases of State v. Mates, 133 La. 714, 63 So. 294, and State v. Pichon, 148 La. 348, 86 So. 893.
 

 “Bill of Exception No. 3 was taken to the Court’s over-ruling defendant’s Motion to Quash and Demurrer. The motion sets forth that the indictment did not inform the defendant of the nature and circumstances of the charge in conformity with Article 1, Section 10 of the Constitution of the State of Louisiana, and that the indictment did not set forth with legal certainty the nature and cause of the accusation, including the circumstances and events which were necessary .to enable the defendant to defend herself, and further, that the indictment did not set forth the means or manner employed to accomplish the alleged offense.
 

 “The indictment in this case is in the short form, as provided by Article 235 of the Code of Criminal Procedure, and the Supreme Court in the case of State v. Capad, 179 La. 462, 154 So. 419, and the case of State v. Daleo, 179 La. 516, 154 So. 437, held that the short form of indictment was sufficient to inform the accused of the nature, cause and circumstances of the ac
 
 *279
 
 cusation, and was not in violation of the constitutional provisions heretofore quoted. See also to- the same effect State v. Eisenhardt, 185 La. 308, 169 So. 417, and State v. Matthews, 189 La. 166, 179 So. 69.
 

 “Bills of Exceptions Nos. 4 and 5 will be treated together because they have to do with a Motion for a Bill of Particulars filed on behalf of the defendant. On March 11, 1949, a Motion for a Bill of Particulars was presented to me requesting that I order the State to furnish to the defendant information as to the cause of death, .the kind and type of poison and its trade name if poison was contended by the State to be the means employed; who the State contends administered the poison, .and if such was administered the day and hour it was so administered, the chemical analysis or reports the State has or seeks to use, and malice or forethought the State contends and plans to employ or use. On March 11, 1949, I over-ruled the defendant’s Motion for a Bill of Particulars, and the defendant excepted, reserving Bill of Exception No. 4 to said ruling. However, on April 7, 1949, another hearing was held in this matter wherein the defendant requested a Change of Venue, and at that time I vacated and recalled my previous order which over-ruled the Motion for the Bill of Particulars, and at that time stated the only reason I over-ruled the motion in the first instance was because the Supreme Court in the case of State v. Augusta [199 La. 896], 7 So.2d page 177, held that where the short form of indictment was used that the defendant in a homicide case was not entitled to be informed of the manner, place, circumstances and instrument with which and by which the deceased was alleged to have been slain. However, after over-ruling the Motion for the Bill of Particulars I ascertained that the Supreme Court, in cases much later than the Augusta case, Supra, had implied that where the short form of indictment was used that the defendant was entitled to a Bill of Particulars as a matter of right, and the District Court had very little discretion in relation to same. Cases so holding: State v. Bessar [213 La. 299], 34 So.2d page 785; State v. Chanet [209 La. 410], 24 So.2d page 670; State v. Masino [214 La. 744], 38 So.2d page 622. Accordingly, I did on April 7, 1949, recall my previous order which overruled the Motion for the Bill of Particulars, and instructed the State through the District Attorney to furnish the following information to the defendant; the cause of death of the decedent; who administered the poison, if it is the contention of the State that deceased was poisoned; the day or hour, or about the hour of the administration of the said poison; the type of poison; and the chemical analysis or report that the State had in its possession and which had already been filed by the Coroner with the Court as a public document. Counsel for defendant reserved Bill of Exceptions No. 5 to my refusal to require the State to furnish all the information requested by
 
 him in the Motion
 
 for the Bill of Particulars. I certainly consider
 
 *281
 
 the information which I ordered to have been adequate to enable the defendant to make out her defense, and if I had granted everything defendant asked in the Motion for the Bill of Particulars I would have been requiring the State to furnish every bit of evidence upon which it depended for a conviction. Certainly the law does not contemplate that all such information should be furnished to the defendant even where the short form of indictment is used.
 

 “Bill of Exceptions No. 6 was taken to my refusal to grant the defendant’s Application for a Change of Venue. A hearing was had on this application on April 7, 1949, at which time the defendant produced some 9 or 10 witnesses who were either her neighbors, friends of hers or her family or relatives. Nearly all of them lived in a section of Bogalusa known as Richardsontown and within a few blocks of the home of the defendant. Practically all of them testified that, in their opinion, the defendant could not obtain a fair and impartial trial in Washington Parish, 'but when questioned by the District Attorney as to how their opinion was formed it is shown in almost every instance that it was formed as a result of talking to people in that section of Bogalusa known as Richardsontown. On the other hand, the State of Louisiana produced some 12 witnesses who, in my opinion, were leading citizens of the parish and lived in different parts thereof. Without exception each of them testified that in their opinion the defendant could obtain a fair and impartial trial in the Parish of Washington. At the time of over-ruling the application for a Change of Venue I was satisfied from the testimony of the witnesses, as well as my own personal knowledge of the matter that the defendant could obtain a fair and impartial trial in this parish. I am further convinced that I was correct in the ruling for the reason that when the Jurors were examined on their voir dire there was but one of them who stated he had formed an impression about the case and even he admitted said impression would yield to evidence. Further than this, not more than 30 jurors were examined before the Jury was obtained, and the time required was less than one day. The evidence shows that the occurrence took place at Bogalusa, Louisiana, which is located in the Fourth Ward of Washington Parish, and the minutes of the Court show that not a single juror from the Fourth Ward of Washington Parish served on said Jury. Article 293 of the Code of Criminal Procedure provides that on an application for a Change of Venue if it shall be established by legal and sufficient evidence that a fair and impartial trial cannot be had in the Parish in which the felony shall be charged to have been committed,, the Judge shall order a change of venue to an adjoining parish of the same judicial district or to a parish of an adjoining district. In the cases of State v. Roberson, 159 La. page 562, 105 So. 621; State v. Collier, 161 La.
 
 *283
 
 856, 109 So. 516, and State v. Washington, 207 La. 849, 22 So.2d page 193, it was held that an application for change of venue was addressed to the sound discretion of the trial Judge and that his ruling thereon would not be disturbed unless an abuse of discretion was shown. Accordingly, for the reasons above set forth, I was of the firm opinion that this defendant could receive a fair and impartial trial in Washington Parish, and accordingly over-ruled the application for a Change of Venue.
 

 “On May 23, 1949, shortly prior to the beginning of the trial, counsel for defendant filed a motion stating that he had learned there was another chemical analysis which had been sent to the District Attorney and which would be sought to be used as evidence, and an exhibit in this cause which were not filed in the office of the Clerk of Court, and in order to compel the State to produce the same defendant, through counsel, moved for a continuance until the production of said analysis and exhibit. It is stated in this Bill that I refused to order the final chemical analysis and exhibit produced and that I further over-ruled the motion for continuance. It is true I over-ruled the motion for a continuance, but the testimony shows that I ordered the District Attorney to file the final chemical analysis which was made by Cassius L. Clay, State Chemist. It was further shown that this final chemical analysis was not received by the State until two (2) days prior to the trial. Further than this, the recital in the Bill is incorrect in stating that the chemical analysis and exhibits were not filed by the State in the office of the Clerk of Court in accordance with order of the Court, for the reason that the order of the Court, as reflected by the minutes of Thursday, April 7, 1949, showed that I ordered the State to file with the Court whatever chemical analysis or report which the State had in its possession on said date. Even though I had not previously ordered the State to file the final chemical analysis, I did order said analysis filed as soon as I ascertained its existence. Further that this, when counsel for defendant asked for a continuance due to what he termed was the lateness of the filing of the report, I asked him what period of time he required, in order to ascertain if the continuance should be granted. He failed to answer me. Further than this, I am satisfied that counsel for defendant was not taken by surprise by this final chemical analysis because his medical expert, Dr. G. W. Peek, and his chemical expert, Dr. R. T. Pursley, testified at great length
 
 in
 
 refutation of everything contained in said report. I consider defendant’s motion for the continuance to be without merit under the circumstances, and I could not help but observe the inconsistency of her counsel’s position. On the one hand throughout his application for a Change of Venue he had contended he. could not obtain a speedy trial in Washington Parish, and after I called a special Jury Term of Court for the purpose of
 
 *285
 
 granting to the defendant a speedy trial he then altered his position and wanted a continuance.
 

 “Bill of Exceptions No. 8 was taken to the over-ruling of defendant’s Motion to Quash the Petit Jury Venire, due to lack of proper, sufficient and legal publication of the list of said Venire. Article 183 of the Criminal Code of Procedure provides as follows: “The clerk shall keep a record of the drawings with a list of all the names in the order they are drawn and showing the week for which they are to serve; and when the drawing and the proces verbal is complete, shall deliver a copy of the same to the sheriff, who shall without delay, proceed to summon all the persons on said list to attend upon the session of the court and to serve for the week for which they are drawn.
 
 The clerk shall cause a copy of said list and the list of grand jurors to be published in the official journal of the parish, if there be one, or in some other newspaper published in the parish,
 
 or, if there be no official journal or other newspaper in said parish, he shall post a copy of these lists on the door of the courthouse”. (Italics mine).
 

 “A mere reading of the above provision of Article 183 shows that the law does not require that the publication of the Jury list be for a period of 30 days or 10 days or any other particular length of time. See State v. Voorhies, 115 La. page 200, 38 So. page 964. Further than this I might add that the testimony does not show how many times the list of the Petit Jury Venire was published in the newspaper; it does, however, show that it was published. I accordingly over-ruled the Motion to Quash the Petit Jury Venire.
 

 “While the District Attorney was making his opening statement he referred to a civil suit for separation which had been filed by the defendant in Pike County, Mississippi. The defense counsel objected to any reference to this civil suit because evidence of such suit would 'be irrelevant and prejudicial, and he therefore moved for the entry of a mistrial. This was refused and he reserved Bill of Exceptions No. 9. During the course of the trial I permitted the State to introduce this petition for separation filed by defendant in the State of Mississippi, and the introduction of the petition was objected to for the reason that the Act of Congress [28 U.S.C.A. § 1738] relates only to the introduction of foreign judgments, and further that this Act was not passed for criminal matters and this constituted prejudicial error to the defendant. I permitted the District Attorney to read the petition over objection of the counsel for defendant, and Bill of Exceptions No. 17 was reserved. I will accordingly consider Bills Nos. 9 and 17 together for they relate to the same subject matter. The District. Attorney, in his opening statement, had stated that he expected to produce witnesses to prove that the defendant and the. husband of the deceased had lived in adul
 
 *287
 
 tery in the City of New Orleans for a period of some two months shortly before the death of the deceased. He further stated that in order to show motive on the part of the defendant that shortly prior to the homicide she went to Pike County, Mississippi, with the decedent’s husband, Will Furr, and there instituted a suit for separation. At the time of the introduction of the petition for separation in evidence he stated that it was done for the purpose of showing motive for the killing on the part of the defendant. An examination of the certified copy of the petition for separation will show that it is properly certified under the Act of Congress by the Chancery Judge and the Chancery Clerk of Pike County, Mississippi. Counsel for defendant contends that only a judgment can be certified in conformity with the Act of Congress, and since this document was a petition that the Act of Congress does not apply. The Act of Congress is not confined merely to Judgments but applies to any public documents as well. In the case of State v. Marks, 127 La. Page 1031, 54 So. page 340, the Court permitted a certified copy of a marriage license from another state which was certified by the Clerk of the Court who was also the Judge of the Court. In the case of State v. Allen, 113 La. page 705, 37 So. page 614, the attestation of a Judge of the Circuit Court of a sister state to a paper certified to by the Clerk of such Court was sufficient to admit the paper in evidence. I was therefore of the opinion that the document was properly certified under the Acts of Congress and was admissible provided it was otherwise relevant, and as I was of the opinion that it was proper evidence to go to the Jury for the purpose of showing motive on the part of the defendant, I admitted same in evidence. In addition to this, the defendant, under cross examination, admitted that she went into the State of Mississippi and filed said suit, and the witness, Will Furr, the surviving husband of the deceased, who was a witness for the defense, admitted he took her there for that purpose. Certainly, under the circumstances, the defendant could not have been prejudiced.
 

 “During the course of the trial I permitted the District Attorney to read to the Jury the Proces Verbal of the Coroner’s Inquest. The defendant objected to this for the reason it did not detain or accuse the defendant and was, therefore, prejudicial, irrelevant and immaterial. I over-ruled the objection and Bill of Exceptions No. 10 was. taken to said ruling. The Proces Verbal of the Coroner’s Inquest which I permitted the District Attorney to read to the Jury was in the following language :
 

 “ We the Coroner’s Jury, after viewing the body and reading the report of the Coroner, conclude that Mamie Popwelf Furr came to her death from Fluoride poisoning on January 25th. 1949, at Bogalusa, La.’
 

 “I admitted the Proces Verbal of the Inquest as evidence of death and the cause
 
 *289
 
 therefor, and not as evidence of any other fact, and the Proces Verbal of the Inquest shows that it does not contain any other fact. I consider same to have been admissible under Article 35 of the Criminal Code of Procedure. It is true the Proces Verbal of the Inquest did not detain or accuse the defendant, and had it done so that would have been a very good reason why it would have been objectionable.
 

 “During the course of the trial I permitted the State to introduce testimony as to the contents of the stomach, vomitus and kidney of the deceased. Counsel for defendant objected to the evidence of any of the organs taken from the body until it was first shown that they had been properly preserved and filed under the control and supervision of the Clerk of Court, who is the custodian of the criminal exhibits, and made so by the Louisiana Code of Criminal Procedure. I overruled that part of the objection that required the State to show that the organs had been under the control and supervision of the Clerk of the Court, but I further ruled that the State had to show that they were under proper supervision before evidence of the analysis of the ■contents would be admissible in evidence. Bill of Exceptions No. 11 was taken to this ruling. Article 155 of the Code of Criminal Procedure provides that in case of commitment of the accused for trial the committing magistrate shall deliver to the ■Clerk’s Office of the Court having jurisdiction -all such properties, matters and things as may be required in evidence, and it shall be the duty of the Clerk to receive and keep them safely and securely subject to the order of the Court, taking care to preserve their identity. However, in the case of State v. Green, 160 La. page 79, 106 So. page 701, the Supreme Court held that the admission of bloody clothes in evidence after identification by prosecuting witness held proper, notwithstanding that they had not been placed in custody of the Clerk of the Criminal District Court. I am further satisfied from the testimony in this case that the organs of the deceased were properly preserved and not tampered with from the time Dr. Ward performed the autopsy until the analysis of the contents of said organs was made by the State Chemist, Cassius L. Clay.
 

 “Bills of Exceptions Nos. 12 and 19 were taken as a result of my refusal to enter a mistrial when the witness, Mrs. Virgil Applewhite, over the objection of counsel, testified that the decedent told her she was sick and had had a cup of coffee at her neighbor’s house, Mrs. Leming, who, of course, is the defendant in this case. The evidence convinced me that immediately after the deceased drank the cup of coffee at the home of the defendant she returned to her own home, which was a distance of only a few feet, and immediately became violently ill. She called another neighbor, who was the witness, Mrs. Apple-white, in order to get the latter to go for the husband of the deceased, and when
 
 *291
 
 questioned by Mrs. Applewhite she stated that she had had a cup of coffee at the home of Mrs. Leming and that it had made her sick. This case was one which depended wholly on circumstantial evidence. Under the circumstances, I was of the opinion that the statement was an exception to the hearsay because it formed a part of the res gestae. See State v. Jackson, 153 La. page 517, 96 So. page 53. State v. Roshto, 169 La. 251, 125 So. page 67. State v. Gunter, 180 La. page 145, 156 So. 203. In addition to this, I would like to point out in connection with these two bills that counsel for defendant had made an opening statement to the Jury in which he stated he expected to prove by the decedent’s family that she had on several occasions threatened to commit suicide, and he further stated that he expected to prove that when the decedent was on the way to the hospital, which was after she had made the statement to the witness, Mrs. Applewhite, that the deceased had stated it was no use for the driver to go so fast because she was going to die anyway. At the time I overruled counsel’s objection to this evidence I stated to him that I intended to permit him to prove the statements that he attributed to the deceased for since this was a case depending wholly on circumstantial evidence that every circumstance, however, remote, which tended to shed any light on the issue would be admissible. Since I am satisfied that the statement was made by the deceased to the witness immediately after she became ill and was nót done so as result of any design on her part, I am of the opinion that it was admissible as a part of the res gestae. But in no event could this defendant have been prejudiced as a result of the statement, for the defendant herself admitted that she gave the deceased a cup of coffee and immediately thereafter, as-soon as the deceased returned to her home, several witnesses saw her vomiting and crying. See State v. Mattio, 212 La. page 284, 31 So. 2nd page 801.
 

 “Bill of Exception No. 13. was taken to the over-ruling by the Court of the objection of counsel for defendant to the introduction of a table cloth which was taken from the home of defendant on the day following the death of the deceased and was kept by the Chief of Police of the City of Bogalusa in a locker for some 30 days at which time it was sent to New Orleans to the State Chemist Clay for analysis. I note that this Bill of Exception states that the table cloth was picked up several days after decedent’s death, but this statement in the Bill is in conflict with the testimony which shows it was the next day after her death. The evidence shows that Chief of Police Boyd was at the home of defendant on the date of death of decedent, and at that time notice (d) the table cloth which was introduced in evidence.' He did not obtain the table cloth on that night, but on the next day while he was in the home of the decedent sent two of the police officers to the home of defendant, a few feet away, to obtain the table cloth. The officers
 
 *293
 
 started to take the table cloth which was on the table at the time they entered defendant’s home and were told by defendant’s son-in-law that that was not the cloth which was on the table the day before. He then went to a hamper containing soiled clothes and got a table cloth which he handed to the officers. They walked out on the back porch of defendant’s heme at which time Chief Boyd arrived, he taking the table cloth from the officers, and his testimony shows that he recognized and identified this cloth as being the same one which was on the table the night before. He then took the table cloth to the police station and locked it in a locker where it was kept for a period of some 30 days, at which time he sent it by two Police Officers to the State Chemist where it was analyzed. The officers corroborated Boyd’s testimony and the State Chemist, Clay, testified they brought the table cloth to him where he analyzed it and kept it under lock and key until the day he brought it into Court when it was introduced in evidence. These facts convinced me the table cloth was property preserved and it was not necessary that it be filed in the office of the Clerk of Court for the reasons stated in disposing of Bill of Exception No. 11.
 

 “Bill of Exception No. 14 recites that I permitted Cassius L. Clay, State Chemist, to testify over the objection of counsel for defense what a Dr. Solimán said was a fatal dose of fluoride and later the 'length of time it took to kill a person. Counsel for defendant complained that this testimony was hearsay and someone else’s opinion and further that I later refused to permit Dr. Peek to give similar testimony and actual case histories of fluoride poisoning at Charity Hospital. Again, I am forced to call the attention of the Honorable Supreme Court to the variance of facts as stated in the Bill of Exception and the testimony taken in connection therewith. The testimony, Page 9 of the transcript, taken in connection with this Bill shows that the witness, Cassius L. Olay, was asked the following question: ‘Are you in a position, from your experience with effects of sodium fluoride and your experience of thirty-six years as a chemist, pharmacologist and toxicologist, to state what is recognized as a minimum fatal dose of sodium fluoride
 
 ?'
 
 Immediately after the question was asked counsel for defendant objected and I overruled the objection for the very obvious reason that the witness was an expert witness, being the State Chemist, and he was asked if he was in a position from his experience of thirty-six years as a chemist to state what was recognized as a minimum fatal dose of sodium fluoride. Naturally, I over-ruled the objection for the reason I did not know what the answer would be. It is true the witness did answer that Dr. Solimán gave a record of a fatal case whereby a person died from four grams of sodium of fluoride. Counsel did not object to the answer and I was consequently not called upon to rule thereon. However, I will state that I most probably would have
 
 *295
 
 permitted the answer to remain in the record for the reason that the chemist had previously testified that the text book, ‘A Manual of Pharmacology by Solimán, Sixth Edition’, was a recognized work on pharmacology. No such situation existed, however, when Dr. Peek, defendant expert, was testifying. Page 22 of the transcript shows that he was asked about case records of deaths from poisoning which he had read at Charity Hospital. The District Attorney objected to the Doctor’s giving testimony as to what the records contained on the ground the records were the best evidence and T sustained the objection. Dr. Peek was further asked about cases in Charity Hospital where actual death resulted from fluoride poisoning, and on objection of the State I instructed the witness to confine himself to cases with which he had had experience. He stated he had not followed the cases from the accident room and did not actually know the result thereof, and counsel for defendant did not seek to elicit further testimony on the point from the Doctor.
 

 “Bill of Exceptions No. IS was reserved by the defendant when I over-ruled his objection to the introduction of the table cloth and the chemical analysis of the said cloth, on the ground that the cloth had not been properly preserved as an exhibit and the Chemist’s report was not filed in compliance with the order of the Court or preserved in the manner of preserving criminal evidence. I have already disposed of all points raised in this Bill in my reasons given in disposing of Bills Nos. 13, 11 and 7.
 

 “Bill of Exceptions No. 16 was taken when I permitted the witness, Mrs. E. L. Magee, to testify over the objection of counsel as to a certain statement made by the defendant to the witness twenty-three (23) days before the death of the decedent to the effect that defendant intended to have deceased’s husband no matter what the cost to get him. The evidence in the case showed that the witness, Mrs. E. L. Magee, on the date of January 2,. 1949, visited the defendant at her home immediately after the defendant had returned from New Orleans where previous evidence showed she had lived in adultery with deceased’s husband. The witness stated she said to the defendant that she did not know the defendant had come back from New Orleans, and the defendant stated that she was back but just because she was back was no sign she had given up the fight, and that she loved Will Furr and intended to have him. The purpose of this evidence was to show motive for the killing on the part of the defendant and the evidence of prior acts, declarations and threats of the accused, though not part of the res gestae is admissible when it substantially tends to establish motive or intention of the accused to commit the crime. State v. Edwards, 34 La.Ann, page 1012.
 

 “Bill of Exceptions No. 18 was reserved by the defendant when the wit
 
 *297
 
 ness, R. G. Rogers, was permitted over objection of counsel for defendant to state that deceased said, ‘Oh, Dinah, what did you do to me?’ Counsel contended that this was a hearsay statement and was prejudicial to the accused. The evidence in the case showed that the nickname of the defendant was Dinah, and it further showed that immediately after the deceased drank the cup of coffee with the defendant she went back to her home a few feet away and called to the witness, Mrs. Applewhite, to get her husband because she was sick. The witness Rogers testified that when Mrs. Applewhite was leaving that he was standing across the street in front of his store and the deceased was crying and vomiting and made the statement, ‘Oh, Dinah, what did you do to me?’ I am satisfied this statement was made a very few minutes after the deceased drank the cup of coffee, and further than this, the statement was not made to the witness Rogers, but was a spontaneous statement which was made as soon as the deceased realized she was so violently ill. I was accordingly convinced that the statement was made under circumstances which precluded any idea of design or calculated policy. I am, therefore, of the opinion that the statement formed a part of the res gestae. See Articles 447 and 448 of the Code of Criminal Procedure; State v. Dale, 200 La. 19, 7 So.2d 371; State v. Mackles, 161 La. page 187, 108 So. 410. In connection with this Bill, I would like to reiterate what I have said in disposing of Bills Nos. 12 and 19 to the effect that where a case depends wholly on circumstantial evidence that every circumstance, however remote, that may tend to shed any light on the subject, is admissible.
 

 “I disposed of Bill of Exceptions No. 19 in disposing of Bill of Exceptions No. 12.
 

 “Bill of Exceptions No. 20 was reserved to my ruling sustaining an objection by the state to a questioii asked the witness, Frank Singletary, if he had ever been sent to a reform school or institution. Section 2 of Act No. 127 of 1942 provides the procedure for commitment of any male child under seventeen years of age to a reform school, and it further provides that the fact that such person shall have been committed to a reform school shall never be received in evidence by any Court in this State thereafter in any proceeding affecting such person. While it could possibly be argued that this was a proceeding that did not affect this witness, I am of the opinion that the defendant was not prejudiced by the ruling for the reason that the witness answered the question. The questions and answers on Page 35 were as follows :
 

 “Q. Were you ever sent to a reform school or institution?
 

 "A. No sir.
 

 “Q. You deny that?
 

 “A. No, I was not.
 

 “It was only after'this evidence had gone in that the state objected to the question
 
 *299
 
 and I did sustain it for the reason I considered it to be improper under the law, but I further stated that the witness had already answered the question. Consequently defendant could not have been prejudiced by the ruling.
 

 “Bills of Exceptions Nos. 21, 28, 29 and 30 all deal with my refusal to permit the defendant’s expert witness, Dr. Pursley, to make experiments with sodium flouride as to its solubility in water and in coffee; to the fact that I would not let him make the experiment to show the acutely salty taste of several flourides; that I would not let him make the experiment to show that 4 grams of either one of the fluorides constituted a teaspoonful, which would impeach the testimony of the State Chemist, Cassius L. Clay, to the effect that 4 grams was only one-third of a teaspoonful; that I would not let him make the experiment which would show it would be impossible to put a fatal dose and dissolve a fatal dose of either one of the several fluoride compounds in a cup of coffee in the presence of anyone. He further complains that the experiment would have shown that the fluoride would have discolored the coffee to such a state as to be ‘unpalatable’ and to cause such a taste to be untakable, and consequently, the experiment would show that the only manner in which a person could conceivably be killed by sodium fluoride was one who intentionally took a large dose for the purpose of committing suicide.
 

 “Counsel for defense further stated to me that it was his desire to permit the members of the Jury to taste the result of the experiment in order for them to ascertain the salty bitter dose of the coffee mixed with the sodium fluoride. The compounds by trade names which were sought to be used in the experiment are what is known as Ant-Bane and Bee Branch Roach Killer. The sodium fluoride content of one of these was 80%, and the sodium fluoride content of the other was 86%. Too, defendant sought to use in the experiment sodium fluoride by Merck which is not sodium fluoride in its pure state, but is sodium fluoride 95%. There was no evidence in the record to show the commercial trade name of the preparation containing the sodium fluoride which resulted in the death of the deceased. I asked the ■witness, Dr. Pursley, if he knew how many other cans of like preparation containing sodium fluoride there were on the market besides Bee-Branch Roach Killer and Ant-Bane, and he answered that he would not make an estimate on it. He further answered he would not make an estimate of the amount of sodium fluoride which was contained in each one on the market. Since there was no evidence in the record to show the trade name of the preparation, which was swallowed by the deceased, I did not consider it proper to permit the experiment to be made with the two or three preparation apparently selected at random by counsel for defendant, with varying
 
 *301
 
 content of sodium fluoride, and likewise varying content of inert ingredients. Further than this, I was of the opinion that the conditions under which the experiment was sought to be made could not be shown to be substantially similar to the conditions that existed when the result contended for occurred. As a matter of fact, it was the intention of the witness to use measures instead of a coffee cup, and it was not even shown the size of the coffee cup the deceased drank from. In addition to this, counsel for defendant stated it was his purpose, after the experiment was made, to permit the members of the Jury to taste the coffee to determine its salty and bitter taste. I certainly would not have forced members of the Jury to have participated in the experiment, and for counsel to have done so might have resulted in embarrassment for the Jury. I did, however, at the request of defense counsel, permit Dr. Pursley to weigh 5 grams of one of the insecticides and then weigh 10 grams, and at the request of the District Attorney I permitted him to weigh 4 grams of said substance. I further permitted Dr. Pursley to make a demonstration before the Jury of the volume of 5 grams, 10 grams and 4 grams by using a teaspoon. The rule as to the admissibility of experiments in evidence is very succulently (succinctly) stated in 22 Corpus Juris ‘Verbo Evidence’, Section 843, page 755, as follows:
 

 “ ‘In accordance with the fundamental principle that the object of all evidence is the ascertainment of the truth with reference to the existence or non-existence of the facts in controversy, the criterion for the admissibility in evidence of experiments is whether such evidence tends to enlighten the Jury and enable them more intelligently to consider the issues presented. Where the experiment is inconclusive, or raises a number of collateral issues, or the evidence seems to the Court not to promise results justifying the time required to hear it, a party cannot insist upon producing it.’ [See also 32 C.J.S., Evidence, § 587.]
 

 “The foregoing principle of law was cited with approval in the case of the State v. Dunn, 161 La. page 532 [109 So. 56.] In this case the Court permitted the experiment for the reason that there was not such a dissimilarity of the conditions in connection with the experiment and the conditions at the time of the occurrence to justify the rejection of the experiment. The experiment in the Dunn case showed that human blood could be detected after being heated, in corroboration of a witness who had testified that he had found human blood on a sewing machine after the burning of a building in which the machine was situated. The conditions were very similar to the Dunn case. While in the present case a mere reading of the testimony shows extensive dissimilarity between the conditions at the time the experiment was offered and the conditions at the time of the occurrence. Particularly is this true when the evidence showed that
 
 *303
 
 the whole purpose of the experiment was to refute the chemical analysis of the State Chemist, Clay, and I permitted both the Chemist and Dr. Peek to testify at length in refutation of Clay’s report containing the chemical analysis. If I had permitted counsel for defendant to have made the experiment with the two or three compounds containing sodium fluoride which he had selected, then upon the request of the State I would have had to permit the State in rebuttal to have likewise gone through experiments with compounds containing sodium fluoride they had selected, and I am of the opinion that the results of all of the experiments would not have justified the use of time required to make them, particularly, in view of the fact that all of the experts were permitted to testify at length to practically the same thing as would have been shown by said experiments. It is my opinion that to have permitted said experiment would have tended to have confused rather than enlighten the Jury.
 

 “I believe I have disposed of the four Bills of Exceptions being now considered except No. 30, and the contents of this Bill of Exceptions show that it was reserved on my refusal to permit defendant’s expert, Dr. Pursley, to testify as to whether or not New Orleans water did not contain as much fluoride as the report made by Cassius Clay of the two pieces of tablecloth which contained 1/2000 part of fluoride. On page 34 of the transcript, Dr. Pursley was asked by counsel for defendant if New Orleans water was used would! it be possible for it to have as much fluoride in it as the report made by Cassius Clay on the two pieces of tablecloth. Counsel' for the State objected on the ground that this was an impossible question, and I then asked the Doctor if he felt competent to. answer the question. He answered that the composition of the water varies, depending on the water content of the river. I then asked him if the varying content of the water would cause him to give a different answer to the question and his. answer was ‘Yes’. So, I naturally sustained the objection, for by the Doctor’s own answers to my questions it is shown that any answer he would have given to the question propounded to him by counsel for defendant could have been nothing more than a guess, and would consequently have been incompetent evidence.
 

 “Bill of Exceptions No. 22 was taken to my refusal to permit a defense witness, Mrs. Geneva Wascom, to testify as to a conversation over the telephone from her house by the defendant’s husband to a Mrs. Furr, supposedly the deceased, in which telephone conversation he asked to speak to her (Mrs. Furr) and further asked her to meet him at 9 o’clock. I refused to permit this testimony for the reason that, first, it was not shown that the Mrs. Furr who was called was the deceased, and second, it was impossible for the witness to relate the whole conversation as she stated she could not hear the person on
 
 *305
 
 •the other end of the line. She simply was ■repeating what she heard someone else •say, and even at that only part of the conversation, and I sustained the State’s objection for the reason that any further •testimony along that line would have been strictly hearsay. I did not, however, as recited in Bill of Exceptions No. 22, refuse to permit testimony relating to decedent’s relation with the defendant’s husband. There is quite a bit of testimony in the record offered by the defense in an effort to show that she gave him a belt buckle and he gave her a robe.
 

 “Bill of Exceptions No. 23 was reserved when I over-ruled defendant’s objection to a question by the District Attorney to Eugene Furr, son of the deceased, when he was under cross examination. The District Attorney asked the boy the following question: ‘Which one of you boys did your father whip for talking too much in the witness room?’ The answer was, ‘Not either one of us.’1 The District Attorney then asked, ‘Was it you?’ and he answered, ‘No, sir.’ Counsel for defendant then objected that this was improper examination and I sustained the objection to the question in the form in which it was asked. The District Attorney then asked the witness if his father punished him or one of his two brothers in the witness room for talking about the case and the witness answered, ‘That if he did I was not there.’ While the question asked by the District Attorney was not in the best of form, I am convinced that the answers .of the witness removed any question that any prejudice was created against the defendant as a result of the interrogation.
 

 “Bill of Exceptions No. 24 was taken when I sustained the State’s objection to a question by counsel for defendant to the witness Eugene Furr, which question was: ‘What does J. M. stand for?’ it being the intended purpose, as shown by the Bill of Exceptions, to show that the ‘J’ stood for the first name of the defendant’s husband, and the ‘M’ stood for the deceased, and the purpose being to show that these were circumstances showing that others had motives to rebut the circumstantial evidence by the State to show the motive of the defendant. The witness had already testified that he was present when the belt buckle was bought with the initials on it of ‘J M’. I refused to permit the witness to testify as to what the letters ‘J M’ stood for because they could have stood for any number of names. I did, however, permit the witness, as shown on page 21 of the transcript, to testify that his mother’s first name was Mamie and that the defendant’s husband’s first name was Jesse, and that the first letter in the name Mamie was ‘M’ and the first letter in the name Jesse was ‘J’. Further than this, I permitted the introduction of the belt buckle in evidence and the Jury had the right to draw any conclusion they saw fit from said evidence.
 

 
 *307
 
 “Bill of Exceptions No. 25 was taken to my refusal to permit Dr. George W. Peek, defendant’s expert, to testify about case records of fluoride poisoning coming to Charity Hospital. The testimony . of Dr. Peek shows that he was attempting to testify from the case records of Charity Hospital and the State objected, that the Hospital records were the best evidence of what they contained and this was my primary reason for sustaining the objection. It is further shown by Dr. Peek’s testimony that he had not had any experience with these cases, but he had made some search of literature and the nature and kind of the literature through which he had searched was not established. For these reasons I sustained the objection to the testimony.
 

 “Bill of Exceptions No. 26 was reserved to my refusal to order a mistrial for the alleged prejudicial remarks and questions asked by the District Attorney in the cross examination of the witness, Nettie Pope, as to the first thing Will Furr, the decedent’s husband, did when he returned from his wife’s funeral. The question propounded by the District Attorney to the witness was :
 

 “ ‘What did you say, you said Will Furr, the first thing he did after he got back was to make a dive for his wife’s pocketbook?’
 

 “Counsel for defendant objected and asked for a mistrial on account of the remark by the District Attorney to the effect that the husband of the deceased dived, for his wife’s pocketbook. The witness, Mrs. Nettie Pope, had previously testified under direct examination that Will Furr was looking for his mother’s pocketbook. Accordingly, I instructed the Jury to disregard the District Attorney’s remark for the reason that I considered it improper under the circumstances, but I am sure the defendant was not prejudiced thereby for the reason that the Jury must have understood, as did I, that the witness had testified that Furr was looking for his mother’s-pocketbook.
 

 “Bill of Exceptions No. 27 was reserved by counsel for the defendant to the sustaining by the Court of an objection by the State to a statement made by one-Lillie Furr. It is stated- in the Bill that Lillie Furr accused the defendant of having poisoned the decedent before the decedent’s death or before there was any evidence or suspicion of poison having been taken by the deceased.
 

 “The testimony on page 18 of Mrs. Hulon Savoy, who was asked the question under direct examination by counsel for defendant, is as follows:
 

 “ ‘Q. Mrs. Savoy, when Lily Furr got to the hospital what did she say ?’
 

 “Lily Furr was a sister-in-law of the deceased and a third person to this proceeding, and while the facts recited in the Bill of Exceptions state that I sustained the objection of the State to remarks made by Lily Furr accusing the defendant of
 
 *309
 
 having poisoned decedent before decedent’s •death, the testimony which is in the transcript taken in connection with the Bill of Exceptions does not show what the import of the question to Mrs. Savoy, the witness, actually was, for the witness was simply asked, ‘When Lily Furr got to the Hospital what did she say?’ The witness never answered the question because the State objected and I sustained the objection on the ground that to have permitted the witness to repeat what Lily Furr, a third person, had said at the Hospital would have constituted the rankest hearsay. I accordingly sustained the State’s objection.
 

 “Bills of Exceptions Nos. 28, 29 and 30 have already been considered in disposing of Bill of Exceptions No. 21.
 

 “During the closing argument of the District Attorney, he stated that defendant Dinah Leming had sworn under oath to two of the most damnable lies he had ever heard. Counsel for defendant objected to the remark on the ground that it was prejudicial and calculated to prejudice the minds of the Jury, and moved for a mistrial, which was refused by the Court, and he accordingly reserved Bill of Exceptions No. 31. I was not requested by counsel for defendant to instruct the Jury to disregard the remarks of the District Attorney, but was simply requested to declare a mistrial. I, however, did not consider the remark made by the District Attorney as- objectionable, for the reason that it was nothing more than a denunciation of the defendant based upon the evidence which had been adduced during the trial. See State v. Thomas, 111 La. 804, 35 So. 914; and State v. Gallo, 115 La. page 746, 39 So. page 1001; State v. Dreher, 166 La. 924, 118 So. page 85. See also Article 381 of the Code of Criminal Procedure.
 

 “Bill of Exceptions No. 32 was taken to my sustaining an objection by the State’s counsel to a statement made by defense counsel to the Jury in his argument. This bill states that my ruling constituted commenting upon the evidence. Counsel objected to my ruling and requested a mistrial, which was refused, and he reserved this Bill. The Statement which counsel made to the Jury was, as shown by the transcript of testimony on page 36:
 

 “ ‘Cassius Clay has been thrown out of more Courts than anyone in the State.’
 

 “Counsel for the State, as shown by the testimony, did object on the ground that there was no evidence in the record of that. I simply stated that I sustained the objection and made no comment one way or the other as to whether or not there was any evidence in the record as to whether the Chemist, Cassius Clay, who testified for the State, had been thrown out of more Courts than any one in the State. I hardly see how anyone could contend that I commented on the evidence by simply sustaining the objection. But I would like now to make the comment that there was not one scintilla of evidence before the Jury
 
 *311
 
 that Cassius Clay, State Chemist, had ever been thrown out of more Courts than anyone in the State. There was no evidence along this line whatsoever.
 

 “Bill of Exceptions No. 33 was taken to my granting Special Charge No. 1 requested by the State on the ground that the charge was misleading, was not a proper statement of the law, was a direct commentation upon the evidence in the case, and as such was prejudicial.
 

 “The Charge which the State requested, and which was given by me, is in the record and is as follows:
 

 “ ‘I charge you, Gentlemen of the Jury, that any physical evidence or reports obtained by the State, that were admitted in evidence, that were not part of the Coroner’s Jury records and that were not covered by any previous orders of this Court, are admissible on the trial of this case, notwithstanding the fact that said evidence or reports were not filed in the Clerk of Court’s office of this Parish.’
 

 “During the course of the trial there had been so many objections raised by counsel for defendant as to the admissibility of evidence on the ground that it was not placed in the custody of the Clerk of Court, or that it was not properly preserved or identified, that I considered it nothing more than fair to charge 'the Jury the Special Charge that all of the reports and other evidence that were admitted in evidence were admissible, notwithstanding the fact that they had not been filed in the-Clerk of Court’s office of the Parish. There-is no question but that this is the law, as-heretofore pointed out in previous Bills of Exceptions which have been disposed of.
 

 “Counsel for defendant requested that I deliver Fourteen (14) special instructions-on behalf of the defendant to the Jury. I granted three (3) of these Special Charges- and refused the other eleven (11).
 

 “Accordingly, Bill of Exceptions. No. 34 was taken to my refusal to give the special charges requested by the defendant. I denied Special Charge No. 2 which had to do with the character of the accused, because as shown by the Charge it is stated that affirmative testimony of expressed oral comments of friends and acquaintances-upon the reputation of the accused is not always required, and that evidence that the character of the accused had never been -denied or doubted, or even discussed or spoken of among his acquaintances, though negative in form, is always admissible and often of the highest value. I did not consider that part of the Charge as to the character of the .accused having ever been denied or doubted as being a correct charge, but I did consider the fact that his character had not been discussed or spoken of among his acquaintances was always admissible and often of the highest value. My General Charge will show that this latter is contained therein. Accordingly, I refused to give Special Charge No. 2.
 

 
 *313
 
 “I refused to give Special Charge No. 3 for the reason that it is covered by the General Charge.
 

 “I refused to give Special Charge No. 6 relative to circumstantial evidence for the reason that it is covered by the General Charge.
 

 [37] “I refused to give Special Charges Nos. 7, 8, 9, 10, 11, 12 and 13, because as the Charges show, they were requested on the ground that they were offenses of less magnitude than the offense charges, and therefore responsive verdicts to the indictment. Act 161 of the Legislature of the State of Louisiana for the year 1948 amended and re-enacted Article 386 of the Criminal Code of Procedure so as to set out for certain specified cases those included offenses which may be responsive verdicts, and upon which the Judge shall charge the Jury. Section 1 shows that the only responsive verdicts which may be rendered and upon which the Judge shall charge the Jury where the indictment charges the offense of murder are:
 

 “1. Guilty as charged.
 

 “2. Guilty without capital punishment.
 

 “3. Guilty of Manslaughter.
 

 “4. Not guilty.
 

 “Since Act 161 of 1948 is the last expression of the Louisiana Legislature what con-' 'stitutes responsive verdicts, and since the defendant in no wise attacked the constitutionality of said Act, I considered it my duty to respect and obey the provisions thereof.
 

 “I, of course, was not afforded an opportunity to rule on the constitutionality of the Act for the reason that the defendant did not attack the constitutionality thereof by filing a motion in Court, as a special plea wherein the pertinent provisions of the Constitution were set forth, together with the ground of the alleged unconstitutionality of the statute. I, therefore, considered it my mandatory duty to charge the Jury unjjer the provisions of Act 161 of 1948. See State v. Kavanaugh, 203 La. Page 1, 13 So.2d page 366, wherein the Supreme Court stated on the application for a rehearing [13 So.2d] at page 382 of the opinion as follows:
 

 “It is well settled that this court can not consider a plea of unconstitutionality of a statute of its own motion but that such a plea must be filed in the district court as a special plea wherein the pertinent provisions of the Constitution are set forth, together with the ground of alleged unconstitutionality of the statute. This was not done and it is too late for the defendant to attempt to do so at this time * *
 

 See also State ex rel. Porterie, Attorney General, v. Jones, 181 La. page 390, 159 So. page 594, State v. Maines, 183 La. page 499, 164 So. 321, and State v. Sonier, 107 La. page 794, 32 So. page 175.
 

 “I refused to give Special Charge No. 14 requested by the defendant which was to the effect that the Jury could qualify any one of the several verdicts with the recommendation that the sentence of the
 
 *315
 
 Court be suspended upon good behavior. The charge would not have been proper for one of the verdicts the Jury could have returned was guilty as charged and under the provisions of Article 530 of Code of Criminal Procedure the Court cannot suspend sentence when the defendant is convicted of a capital offense. She was actually convicted of a capital offense with a qualified verdict. I therefore refused said Special Charge.
 

 “Bill of Exceptions No. 35 was taken to my over-ruling defendant’s motion for a new trial. This motion for a new trial contained nothing more than the various errors which it is alleged were committed during the course of the trial and formed the basis of the Bills of Exceptions heretofore disposed of, and I accordingly overruled said motion for a new trial.
 

 “Bill of Exceptions No. 36 is a Motion in Arrest of Judgment and a Supplemental Motion in Arrest of Judgment. The original motion in arrest of judgment contains nothing more than the various errors which it is alleged were committed prior to and during the course of the trial and which have been heretofore disposed of in the consideration of the various Bills. I accordingly overruled the original Motion in Arrest of Judgment.
 

 “Article I of the Supplemental Motion in Arrest of Judgment simply re-alleges and reiterates the allegations set forth in the original Motion in Arrest of Judgment. However, in Article II of the Supplemental Motion in Arrest of Judgment, the defendant states that a new trial should be granted for the reason that manifest errors and prejudicial statements made by the District Attorney in his closing address appealing to local pride prejudiced the minds of the Jury against the defendant. He sets forth under the letters a, b, c and d under Paragraph II of this Supplemental Motion the statements which the District Attorney allegedly made to the Jury in his closing address. While I am of the opinion that the District Attorney did not make the-statements to the Jury, as set out under paragraphs a, b, and c of Paragraph II of the Supplemental Motion in Arrest- of Judgment, yet it is in truth and in fact unnecessary to consider whether or not such statements were made in argument by the District Attorney, for the reason that no. objection was made at the time the alleged objectionable remarks were made, and in order to avail the defendant such objections, had to be made at the time of the making of the remarks. See State v. Briscoe, 30 La. Ann. page 433; State v. Dalcour, 145 La. page 1008, 83 So. page 223; and State v. Henry, 200 La. page 875, 9 So.2d page 215. See also State v. Bell, 146 La. page 89, 83 So. page 419 to the
 
 effect
 
 that language used in argument and even when objected to must be inserted in a bill of exceptions. As to the complaint to the remark of the District Attorney which is shown under the letter ‘d’ of paragraph II of Supplemental Motion in Arrest of Judgment, I 'have already disposed of this remark by the Dis
 
 *317
 
 trict Attorney in disposition of the Bill of Exceptions No. 31. I might further state that the District Attorney in arguing the Supplemental Motion in Arrest of Judgment emphatically denied making the statements attributed to him by defense counsel.
 

 “In Paragraph III of the Supplemental Motion in Arrest of Judgment, the defendant states that at least two of the jurors have made public statements that the jury convicted the defendant because she tried to get the venue changed declaring that she could not get a fair and impartial trial in Washington Parish, and because she got an outside lawyer to represent her in the Change of Venue and they returned the verdict of guilty because of this.
 

 “Article 517 of the Code of Criminal Procedure provides that a motion in arrest of judgment lies only for a substantial defect patent upon the face of the record, and Article 518 of the Code of Criminal Procedure provided that no defect that is merely formal and cured by verdict or that cannot be ascertained without an examination of the evidence is good ground for arresting judgment. The case of State v. Calloway, 174 La. 134, 140 So. page 2, holds that a motion in arrest of judgment cannot be aided by evidence. Even if such a statement had been made by a member of the Jury, of which I frankly state I have grave doubts, this would not be sufficient to grant the motion in arrest of judgment, for the reason there is no substantial defect patent upon the face of the record. For the above reasons, I accordingly refused to grant the Motion in Arrest of Judgment.”
 

 No error being found in the ruling of the trial judge, the judgment is Affirmed.
 

 PONDER, J., recused.