420 So.2d 126 (1982)
STATE of Louisiana
v.
John Wayne TONUBBEE.
No. 81-KA-2643.
Supreme Court of Louisiana.
September 7, 1982.
Rehearing Denied October 15, 1982.
Dissenting from Denial of Rehearing October 21, 1982.
*128 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Patrick G. Quinlan, Asst. Attys. Gen., Harry F. Morel, Jr., Dist. Atty., Abbott J. Reeves, Asst. Dist. Atty., Julie E. Cullen, Asst. Atty. Gen., Baton Rouge, for plaintiff-appellee.
Victor E. Bradley, Jr., Norco, Harriette R. Merrell, Slidell, for defendant-appellant.
DIXON, Chief Justice.[*]
Defendant John Wayne Tonubbee was charged by grand jury indictment with two counts of first degree murder (R.S. 14:30). Following a trial by jury, defendant was found guilty as charged and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. It is from this conviction and sentence which defendant appeals, urging thirty-one assignments of error.[1]
On April 19, 1980, between 11:10 and 11:33 p. m., Pauline Odom and Leo Dufrene were struck and killed by a vehicle on Highway 90 near Paradis, Louisiana. The St. Charles Parish Sheriff's Office had received a call regarding a body lying on the side of the road. The investigating officer discovered Pauline Odom fatally injured near a light blue automobile. Shortly thereafter, Scott Perret and Paul Templet arrived at the scene. It was learned that the two young men had stopped to aid Odom whom they had seen stumbling across the highway, apparently drunk. Templet remained with the woman while Perret drove off to phone for assistance. According to Templet, a middle-aged man later identified as Leo Dufrene stopped to assist. Templet stated that he was kneeling on the ground holding Odom's head while Dufrene was standing in front of him. Hearing footsteps behind him, Templet turned around and glimpsed a dark complexioned, mustached man wearing dark clothes before he was hit on the head and rendered semiconscious. When Perret returned, he found Templet staggering down the highway with a gash on his head. The two men returned to the scene and found the police already there.
Further investigation revealed that on the night of her death Ms. Odom had been drinking at Blondy's Lounge, where she was eventually refused service due to her drunken condition. A customer at the bar testified that Odom had talked casually with the defendant before reluctantly leaving the premises with him around 11:00 p. m.
The police officers then proceeded to defendant's residence. The house was located in a camp owned by defendant's employer; defendant shared the house with Roy Stapleton. Stapleton escorted the officers into the house and led them into defendant's bedroom where defendant was found asleep. The officers handed the defendant his clothes and defendant accompanied them to headquarters.
Meanwhile, Roy Stapleton's truck was located abandoned behind a lounge a block off the highway. Defendant had borrowed the truck on the day in question. The front grill and bumper were damaged. Blood, hair and body tissue were spotted on the front of the truck and a man's shirt was twisted around the drive shaft. The blood samples were later matched with the victims' blood and the shirt was later identified as belonging to Leo Dufrene.
*129 The blue car parked next to Odom's body had been identified as belonging to Dufrene, but Dufrene could not be located. Finally, at dawn on April 20, 1980, Dufrene's body was discovered on the median of the highway 120 feet from the location of Odom's body.
Defendant was indicted by the grand jury for first degree murder. The prosecution was subsequently quashed because the district attorney was related to one of the victims. The attorney general's office then took charge of the case and presented it to the grand jury a second time. A second indictment was returned. On May 5, 1981, defendant was convicted of two counts of first degree murder and was sentenced the following day to life imprisonment without benefit of parole, probation or suspension of sentence.
Assignments of Error Nos. 2, 9 and 10
By these assignments defendant contends that he was arrested in his home without a warrant in violation of the Fourth Amendment of the United States Constitution and Art. 1, § 5 of the Louisiana Constitution of 1974. Defendant asserts that the warrantless arrest was made without probable cause, and without exigent circumstances for the intrusion of a constitutionally protected area, and, therefore, all evidence seized as a result of this arrest should be suppressed under the "fruit of the poisonous tree" doctrine. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Detective Bolling, the arresting officer, stated that he did not procure an arrest warrant for defendant before going to the house because he just wanted to question him. He stated that defendant was not placed under arrest until sometime later at the sheriff's station, after Leo Dufrene's body and the truck were found.
The detective's story was corroborated by Officer Boudreaux and Roy Stapleton. Stapleton testified that he resided with defendant in a camp owned by Jack Allen, defendant's employer. When the detectives arrived, Stapleton was across the road on his houseboat. He informed the detectives that defendant was sleeping in the house. Stapleton was asked to remove any guns from the house, which he did. He then gave the detectives permission to enter the house and led them to defendant's bedroom. Approximately five policemen stood around the bed while Stapleton awakened defendant.
When defendant sat upright on the bed the police told him to get dressed to come to headquarters in Hahnville for questioning. One of the police officers handed defendant his pants. While defendant was dressing it was determined that he was putting on the same clothes that he had worn the previous night. Stapleton stated that his truck was mentioned and defendant, who had used it the day before, did not know where it was or where the keys were.
It is clear that the detectives entered the house with the consent of one of its occupants. The testimony of all of the witnesses to this confrontation established that defendant was asked to accompany them to headquarters for questioning. Defendant did not decline the request or otherwise voice his disapproval. Under the circumstances, there is no reason to believe that defendant's action was not voluntary.
These assignments lack merit.
Assignments of Error Nos. 1 and 13
By these assignments defendant contends that the trial court erred in denying his motion to suppress the photographic lineup identification. The basis for the motion is the assertion that the lineup was suggestive and the chain of evidence was not maintained.
The record shows that Paul Templet chose defendant's picture during the photographic lineup. Templet testified that he was given a stack of seven photographs. The man in each photograph had similar physical characteristics and was pictured with a mustache and either black or dark brown hair. Templet stated that he looked through the stack three or four times before making a selection and no suggestion or indication was made with regard to the picture he should choose. He also stated *130 that he signed his name on the back of the picture he chose.
This court has previously held that there are "[n]o exact detailed criteria for a legitimate photographic lineup.... [T]he fundamental rule is that each case must be considered on a careful analysis of its own facts...." State v. Morgan, 367 So.2d 779, 783 (La.1979). An analysis of the facts in the instant case indicates that particular care was displayed by the police officers in selecting photographs of men with physical characteristics very similar to those of defendant. In fact, the trial judge commented while viewing the pictures that "all of the pictures look alike ... to the extent that those people could be look alikes." The trial court properly denied the motion to suppress.
Defendant's argument with respect to the "integrity" of the chain of custody is without merit. Detective Bolling testified that the photographs remained in his custody at all times. Additionally, Templet testified that he chose defendant's photograph during the photographic lineup and he identified his signature on the back of it. It is undisputed that the photograph chosen by Templet was the same one admitted into evidence.
These assignments lack merit.
Assignment of Error No. 3
By this assignment defendant contends that he was denied a speedy trial.
Defendant was indicted by the grand jury on May 2, 1980 following his arrest on April 20, 1980. Pursuant to a motion for a speedy trial signed by the trial court on September 3, 1980, a trial date was set for October 28, 1980. On September 10, 1980, however, the District Attorney of St. Charles Parish recused himself on the ground that he was related to one of the victims, Leo Dufrene. Defendant filed a motion to quash the original indictment, which motion was sustained by the court on September 30, 1980. Defendant remained in custody until October 23, 1980 when the court ruled at a preliminary examination that there was no probable cause to hold him. A new grand jury was subsequently empaneled under the direction of the attorney general's office and defendant was indicted a second time. Following a series of motions the trial date was set for April 21, 1981. Defendant did not file a motion for a speedy trial subsequent to the second indictment.
The length of delay between defendant's original arrest and the beginning of the trial was one year. Following the filing of defendant's motion for a speedy trial on the first indictment, a trial date was set for less than two months later. However, pursuant to defendant's subsequent motion to quash, the entire prosecution was dismissed. Despite the fact that defendant did not request a speedy trial following the second indictment, the trial began four months later. Moreover, defendant does not assert that his ability to adequately prepare his defense was impaired or that defense witnesses or evidence had become unavailable due to the delay. See State v. Dewey, 408 So.2d 1255 (La.1982).
Defendant argues that the delay was occasioned by the district attorney's failure to recuse himself until four and one-half months after defendant's arrest. However, the district attorney recused himself pursuant to defendant's motion and defendant does not maintain that the district attorney acted in bad faith. Furthermore, at the time the district attorney was recused, a trial date had already been set. Defendant could have proceeded to trial on that date, but chose to have the indictment quashed; he made no speedy trial request subsequent to the second indictment.
Considering these factors, especially the fact that no prejudice has been shown, the defendant was not deprived of his constitutional right to a speedy trial.
This assignment lacks merit.
Assignment of Error No. 6
By this assignment defendant contends that the trial judge erred in not ordering a recess to allow defense counsel to thoroughly examine Detective Bolling's entire file to make notations and copies as might be required.
*131 Detective Bolling was testifying at the preliminary hearing on October 23, 1980 about statements made to him by Tina Robinson regarding her whereabouts on the night of the homicides. Tina Robinson had previously given a formal written statement from which Bolling read as he testified. During cross-examination defense counsel requested that he be allowed to examine the contents of the detective's folder and requested a recess in order to do so. Defense counsel was permitted to view the contents of the folder for a short period of time in court while cross-examining the witness, but the recess was not granted. Defendant claims that under this court's ruling in State v. Valentine, 375 So.2d 1378 (La.1979), the court should have ordered the recess to allow him to thoroughly examine the document in order to intelligently examine the witness.
In Valentine, the trial judge refused to permit defense counsel to examine the notes from which a prosecution witness was testifying. In this case, however, defense counsel was permitted to view the notes from which the prosecution witness was testifying. Nevertheless, defense counsel asserts that the trial court should have granted a recess to permit him to copy and make notations from the notes, an issue that was not addressed in Valentine.
Whether to grant or deny a recess is a matter within the sound discretion of the trial court, and its ruling with respect thereto will not be disturbed absent a showing of abuse of discretion and a showing of specific prejudice resulting therefrom. See State v. Telford, 384 So.2d 347 (La.1980); State v. Bertrand, 381 So.2d 489 (La.1980); State v. Gordy, 380 So.2d 1347 (La.1980).
The record reflects that the parties had been allowed complete discovery prior to trial. Counsel for both parties and the trial judge agreed that everything in the state's case file had been subject to discovery by the defense, including all police reports and statements by witnesses. Defense counsel does not claim that he was denied access to the statement during discovery. Therefore, the trial judge did not abuse his discretion in refusing to grant the recess.
This assignment lacks merit.
Assignment of Error No. 7
By this assignment defendant contends that the trial court erred in ordering him to furnish the state a copy of defendant's polygraph examination.
The trial court granted defendant's motion for funds to pay for a private polygraph examination of defendant. Subsequent to the examination, the state filed a motion, based on C.Cr.P. 725, requesting the results of this test. The trial court ordered defendant to provide the state with the results, which defendant did on April 21, 1981. Defendant asserts, however, that the order was improper, inasmuch as the results of a polygraph test are inadmissible at trial, and so were never intended for use at trial. Defendant argues that discovery of the polygraph tests is not justified by either C.Cr.P. 725[2] or C.Cr.P. 728.[3] Polygraph examinations are generally regarded as a type of scientific evidence. State v. Catanese, 368 So.2d 975 (La.1979). Since C.Cr.P. *132 728 specifically exempts scientific reports from its requirements, C.Cr.P. 725 governs the admissibility of polygraph examination results.
In ordering defendant to provide the state with the results of the examination, the trial judge stated that as he remembered it, there was an agreement that if state funds were going to be used, the test results would be made available to both sides. Such an agreement, however, is not substantiated by the record.
If the defendant, under C.Cr.P. 719, is allowed to copy reports of scientific tests in possession of the district attorney and intended for use at trial, C.Cr.P. 725 permits the state to inspect or copy reports of similar scientific tests or experiments in the defendant's possession intended for use at trial. The results of a polygraph examination are inadmissible in Louisiana when offered at a criminal trial by either party, either as substantive evidence or as relating to the credibility of a party or witness. State v. Davis, 407 So.2d 702 (La.1981); State v. Catanese, supra. Since the results could not be referred to at trial, the trial court erred in ordering defense counsel to provide the state with the results of the examination. However, such an error does not necessarily constitute reversible error. "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." C.Cr.P. 921 (emphasis added).
The results of the polygraph examination were never introduced into evidence and no reference was made to the fact that the lie detector test was given. Defense counsel failed to show any prejudice that may have resulted from the state's inspection of the test findings. Therefore, any error that might have occurred here was harmless, inasmuch as it did not affect a "substantial right of the accused."
Assignment of Error No. 11
By this assignment defendant contends that the trial court erred in allowing the St. Charles Parish Sheriff to sit at the counsel table during voir dire.
The prosecution in this case was handled by the office of the attorney general, as the district attorney was recused. During voir dire the trial judge allowed the sheriff to sit with the prosecutors to assist by providing relevant information concerning the parish.
Defendant asserts that his trial was prejudiced by the presence of the sheriff, with his badge on, at the counsel table. However, this court has never held that such actions necessarily prejudice a defendant's trial. Defendant cites no statutory authority for his position, nor does he show any specific prejudice that resulted from the sheriff's presence at the counsel table.
This assignment lacks merit.
Assignments of Error Nos. 12 and 14
By these assignments defendant argues that the trial judge erred in admitting gruesome photographs of the victim since their probative value did not outweigh the possible prejudice to the jury. State v. Matthews, 354 So.2d 552 (La.1978).
Defendant points out that the state refused his offer to stipulate as to the victims' injuries and the location of the bodies unless defendant would likewise stipulate that the photographs showed his specific intent to kill. Defendant maintains that the injuries sustained were consistent with injuries suffered in any vehicular homicide, and, therefore, these photographs were not relevant to show specific intent.
The photographs which defendant objects to are:
SE-# 3upper half of Odom by car
SE-# 4full body by car, Odom
SE-# 5upper half of Odom by car
SE-# 15full body, Dufrene
SE-# 16full body, Dufrene
SE-# 17face and shoulders, Defrene
SE-# 18back and head, Dufrene
SE-# 19face, Dufrene
Defendant contends that the graphic color and the repetitiveness of the photographs encouraged the jurors to overemphasize prejudicial material with little evidentiary value.
*133 A trial court's ruling with respect to the admissibility of allegedly gruesome photographs will only be disturbed if the prejudicial effect of the photographs clearly outweighs their probative value. State v. Landry, 388 So.2d 699 (La.1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981):
"... In weighing the relative probative value of proffered evidence against its probable prejudicial effect, whether the evidence is merely cumulative is a factor to be considered...." State v. Manieri, 378 So.2d 931, 933 (La.1979).
In the instant case two of the photographs depicting the body of Pauline Odom are virtually identical. No legitimate purpose can be attributed to the introduction of the second photograph.
The state maintains that it introduced the photographs to pinpoint the location of the bodies, the extent and nature of the injuries and the clothing worn by the victims in order to link them with Stapleton's truck and to corroborate other evidence. Although the photographs were unpleasant and distasteful, the state argues that they were not so gruesome as to inflame the jury against the defendant. State v. Vernon, 385 So.2d 200 (La.1980).
Even though distasteful, these photographs were held to be relevant, having a probative value which outweighed any possible prejudicial effect on the jury when they were offered to prove the injuries, to corroborate other evidence indicating the manner of death and to identify the victims. State v. Motton, 395 So.2d 1337 (La. 1981), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981); State v. Vernon, supra.
In regard to defendant's argument that his offer to stipulate as to the contents of the gruesome photographs was refused, this court held in State v. Bodley, 394 So.2d 584, 591 (La.1981):
"... While the existence of an offered stipulation necessarily bears upon a balancing of the probative value of the photographs against their prejudicial effect, the decision nevertheless remains one for the trial court...."
The existence of the stipulation together with the introduction of the two virtually identical photographs are additional factors to be considered in balancing the probative value of the evidence against any possible prejudicial effects. State v. Manieri, supra. Since the photographs were relevant to show intent to kill or inflict great bodily harman issue not stipulated to by the defendantand since the cumulative effect of the two duplicate photographs was not clearly inflammatory, the trial judge did not clearly abuse his discretion in concluding that the probative value overcame any possible prejudicial effects. State v. Landry, supra; State v. Sawyer, 350 So.2d 611 (La.1977).
These assignments lack merit.
Assignments of Error Nos. 15, 16, 17, 18, 19, 20, 21 and 22
By these assignments defendant contends that the trial court erred in admitting various items of physical evidence without the proper foundation. The defendant claims that the chain of custody was not properly established for the introduction of these items since they were obtained and handled by many different people.
The test for admissibility of demonstrative evidence was described in State v. Paster, 373 So.2d 170, 177 (La.1979):
"To admit demonstrative evidence at trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence. For the admission of demonstrative evidence, it suffices if the foundation laid establishes that it is more probable than not that the object is relevant to the case. Lack of positive identification goes to the weight of the evidence rather than to its admissibility. Ultimately, connexity is a factual matter *134 for determination by the trier of fact. State v. Drew, 360 So.2d 500 (La.1978)."
A review of the record in the instant case shows that all items of evidence in question were relevant to issues at trial and were identified, both directly and by chain of custody, in such a manner as to establish their connexity to the case.[4] The investigating officers testified as to their involvement with each piece of evidence admitted and as to the procedures established to maintain security of the evidence. It is true a possibility exists that one of the participating criminologists misplaced a piece of cloth with blood-like samples taken from one of the bottles since two cloths were placed in the vial and only one remained to be tested. In addition, a shoe was moved at the crime scene before the crime scene technician arrived. The law, however, does not require the foundation to negate every possibility of tampering. State v. Dotson, 260 La. 471, 256 So.2d 594 (1971), cert. denied, 409 U.S. 913, 93 S.Ct. 242, 34 L.Ed.2d 173 (1972). The exhibits introduced were connected with the case. State v. Paster, supra. Any deficiencies in the chain of custody were properly attributable to the weight, rather than to the admissibility of the evidence.
These assignments lack merit.
Assignment of Error No. 24
By this assignment defendant contends that the trial court erred in admitting a diagram of the crime scene made as part of the police record.
The diagram depicted the location of the two bodies and the probable path of the vehicle as adduced from the physical evidence at the crime scene. Defendant asserts that the diagram is irrelevant.
This court in State v. Prestridge, 399 So.2d 564 (La.1981), held that diagrams are admissible to aid the jury in understanding testimony if they are a reasonable visual demonstration of the events which the witnesses are relating. The accuracy of the diagram herein was attested to by Deputy Curtis Scott and State Trooper Jimmy Mahan, who were both present at the crime scene at various times (the two men drew the diagram). Even though Odom's body and Dufrene's automobile had been removed by the time Mahan arrived at the scene, Deputy Scott was present prior to the transfer of the body and vehicle from their original location. Since the diagram appears to be relevant and there is no evidence to refute its accuracy, we find no error in the trial judge's ruling.
This assignment lacks merit.
Assignment of Error No. 25
By this assignment defendant contends that the trial court erred in admitting hearsay statements of defendant that were made to state witness Billy Ray Reno.
Pauline Odom was seated in Blondy's Lounge next to Billy Ray Reno and defendant about 10:30 p.m. (approximately one hour before her death). Reno testified that Ms. Odom had been "cut off" from alcoholic beverages at the bar because of her drunkenness and that defendant attempted to get her to leave with him. He declared that Odom stated to him: "I don't want to leave here. I don't want any trouble. I love this place around here. I only want to be happy." Reno explained further that defendant responded to Odom: "If they want to party here all night, let them party here all night but we're goin'. Either you come along with me or I'm gonna knock your butt off and take you out." Reno later saw *135 defendant and Odom walk out of the door together.
This court has adopted Professor McCormick's definition of hearsay evidence:
"`... testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.'" (Citation omitted). State v. Martin, 356 So.2d 1370, 1373-74 (La.1978).
In this case it is clear that Reno's testimony regarding Odom's statements was not hearsay since the out-of-court statement was offered as circumstantial proof of the victim's state of mind prior to the homicide. State v. Raymond, 258 La. 1, 245 So.2d 335 (La.1971), appeal dismissed, Ramos v. Louisiana, 404 U.S. 805, 92 S.Ct. 101, 30 L.Ed.2d 38 (1971). Evidence of her fear of defendant or her emotional reaction to his presence is relevant to show that contact between the victim and defendant occurred. State v. Raymond, supra. Admission of the out-of-court declaration of the victim is premised upon the expedient rule that "... conduct or declarations of the decedent shortly before [her] killing may sometimes be admissible as tending to show immediately antecedent circumstances explanatory of the killing and tending to connect the accused with it.... State v. Raymond, supra 245 So.2d at 342 (concurring opinion)." State v. Weedon, 342 So.2d 642, 646 (La. 1977). Odom's statements to Reno are admissible as circumstantial evidence of her state of mind concerning the defendant less than an hour before her death.
Reno also testified as to defendant's conversation with Odom. At trial Reno recalled the defendant telling Odom: "Either you come along with me or I'm gonna knock your butt off and take you out."[5] This statement to the victim constitutes a threat.
Reno's testimony about defendant's conversation does not qualify as hearsay because it was not introduced to prove the truth of the matters asserted. "... Rather, the conversation is admissible to show that it occurred...." State v. Boyd, 359 So.2d 931, 938 (La.1978). Evidence of previous quarrels between the defendant and the victim or of previous threats made by the defendant to the victim has previously been held admissible to attest to the intent of defendant to commit a crime in a case where he denies that he is the perpetrator. State v. Leming, 217 La. 257, 46 So.2d 262 (1950); State v. Winstead, 204 La. 366, 15 So.2d 793 (1943). In prosecutions for murder, proof of prior difficulties and of threats made by defendant against the victim are admissible. State v. Morris, 397 So.2d 1237 (La.1980); State v. Thibeaux, 366 So.2d 1314 (La.1978); State v. Sharp, 174 La. 860, 141 So. 859 (1932); State v. Davis, 154 La. 295, 97 So. 449 (1923). Thus the threatening statements made by defendant to the victim are admissible to establish a motive or the intent of the defendant to harm the victim. State v. Leming, supra.
This assignment lacks merit.
Assignments of Error Nos. 27 and 28
By these assignments defendant contends that the trial court erred in denying his motion for a new trial.
The basis for defendant's motion was that the evidence was insufficient to support a finding of specific intent to kill or inflict great bodily harm upon more than one person.
Several witnesses testified that on the night that Pauline Odom was killed, she and defendant were drinking together in Blondy's, and that she left the bar with defendant only after being threatened by him: "Either you come along with me or I'm gonna knock your butt off and take you out." The testimony established that the two left the bar together around 11:00 p. m.
*136 Paul Templet testified that shortly after 11:00 p. m. he saw Odom alive, staggering across the highway, and he stopped to assist her. He stated that he was kneeling over Odom, and Leo Dufrene (who also had stopped to assist) was standing in front of him when he heard footsteps from behind. He looked up and saw a dark complexioned man with a mustache, dressed in dark clothes, whom he later identified as defendant in a photographic lineup. He was then hit over the head and rendered semiconscious.
The evidence also reveals that Odom and Dufrene were struck and killed by a truck belonging to Roy Stapleton, the man with whom defendant was living. Stapleton stated that defendant was using the truck the day Odom and Dufrene were killed. Finally, a state witness testified that he saw defendant driving the truck as late as 6:00 p. m. on the day in question.
In addition, the experts testified that the shirt defendant wore that night was stained with human blood.
Defendant's version of the facts is that he left the camp in Stapleton's truck about 9:00 a. m. to cash his paycheck. After he got the check cashed later that morning, he started drinking at Slim's about 2:00 p. m., leaving the truck in Slim's parking lot at this time. About 4:30 p. m. he walked to Blondy's where he met Pauline Odom for the first time and bought her a "beer or two." Odom left shortly thereafter but defendant stayed at Blondy's until around 8:00 p. m. As he walked out of Blondy's on his way back to Slim's, defendant met a "friend" named Jim, to whom he loaned Stapleton's truck. Jim was an acquaintance with whom defendant had spoken casually on several occasions. Defendant did not know Jim's last name or where he was employed, and Jim was never located. Defendant testified that he spent the rest of the evening, until about 11:00 p. m., in Blondy's where he witnessed the fight between Pauline Odom and her boyfriend Eddie Legg, prior to Legg's leaving the bar. After Legg left, Odom drifted over to the bar and talked to defendant for about twenty minutes. Defendant stated that he then went to the restroom and left Blondy's by the back door in order to avoid any trouble with Odom and her boyfriend Legg.
Defendant stated that since Jim had not returned with the truck, he first wandered over to Mike's Place and ordered a drink. He then hitched a ride with an unknown person to J. & D.'s Bar, where he called Juanita Dufrene, his girl friend. Juanita arrived at J. & D.'s and they socialized until about 1:00 a. m. before leaving to eat at Captain Leo's Restaurant. Juanita drove defendant back to the camp about 2:00 or 2:30 a. m. Defendant denies driving the truck after about 2:00 p. m., when he parked it at Slim's Bar. He denies leaving the bar with Odom and he also denies making any statement while riding to police headquarters.
The evidence contradicts defendant's testimony and leads to the conclusion that defendant and Odom left the bar together in the borrowed red and white truck. Whether defendant was driving the truck when it struck the victims, and whether he had specific intent to kill or inflict great bodily harm on them, are determinations deduced from the established facts of the case.
Defendant had possession of the truck which mangled Dufrene's body. He talked with an intoxicated, flirtatious Odom in a bar, and they were both denied service by the bartenders. He failed to convince Odom to leave with him until he threatened her. Defendant and Odom left together at 11:00 p. m. At about ten minutes after 11:00 p. m. Templet and Perret stopped on the highway not far from Blondy's to assist Odom, drunk but as yet unharmed. Perret went to telephone. Dufrene joined Templet, and Templet was struck from behind by a dark complexioned attacker.
Templet's identification of defendant was not certain because of the darkness and the swiftness of the unexpected attack. Nevertheless, the description he gave resembled Tonubbee, whose photograph he selected in the lineup. Always admitting the possibility of error, Templet's identification of Tonubbee *137 was consistent and convincing to the jury.
Ten or fifteen minutes after the killings, defendant wandered into a barroom a short distance down the road. His damaged truck, with flesh, hair and clothing clinging to it from the collision with the victims, was found a block and a half off the highway behind that barroom.
Wreckage from defendant's truck was recovered from the death scene and human blood was found on his shirt.
The Louisiana rule as to circumstantial evidence is:
"... assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." R.S. 15:438
Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires, to support a conviction, that the evidence be sufficient to convince any rational trier of fact of defendant's guilt, viewing the evidence in the light most favorable to the prosecution.
Both rules are satisfied in this case. Every reasonable hypothesis of defendant's innocence is excluded by the facts which the evidence tends to prove. No contrary hypothesis is consistent with the evidence. The evidence is sufficient to convince a rational fact finder, viewing the evidence in the light most favorable to the prosecution, of defendant's guilt.
These assignments lack merit.
Assignment of Error No. 29
Defendant contends that his trial was prejudiced by the four and one-half day recess ordered by the trial court when the state applied for supervisory writs to this court.
Defendant did not raise his objection to the recess in the trial court until he moved for a new trial. He could have registered his objection either when the recess was granted or when the trial resumed at the end of the recess. See C.Cr.P. 708, Comment (b).
The record reveals that during cross-examination of the defendant, the prosecutor attempted to impeach him with a prior inconsistent statement made during a pre-test interview with the polygraph administrator. The judge refused to allow any questioning by the state that in any way related to the polygraph test administered to defendant. Nevertheless, he recessed the trial on Wednesday morning until the following Monday morning to allow the state time to apply for writs to this court. The writ request was denied and the trial commenced the following Monday, four and one-half days later.
To impeach the credibility of the defendant, the state has to lay the foundation required by R.S. 15:493, which states:
"Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible." (Emphasis added).
Accordingly, an inquiry about the circumstances under which the prior inconsistent statement was made would have been necessary. The statement occurred during the pre-test interview with the polygraph tester. The existence of a polygraph examination cannot be referred to in a criminal trial to bear upon the credibility of the defendant. State v. Davis, 407 So.2d 702 (La. 1981); State v. Catanese, supra. The end result of laying the proper foundation would be to put the jury on notice that a polygraph examination had been administered to the defendant. This is impermissible.
Since this attempted cross-examination of defendant would have led necessarily *138 to inadmissible testimony, the trial judge properly refused to allow the state to pursue this line of questioning. However, the judge also granted the state a recess to apply for writs on this issue. The grant or denial of a recess is largely within the discretion of the trial court. State v. Bertrand, supra; State v. Charles, 350 So.2d 595 (La.1977); State v. Sharp, 321 So.2d 331 (La.1975); State v. Richmond, 284 So.2d 317 (La.1973). An appellate court will not overturn the trial judge's decision absent a clear abuse of discretion. State v. Bertrand, supra; State v. Robertson, 358 So.2d 931 (La. 1978); State v. Jenkins, 340 So.2d 157 (La. 1976).
The four and one-half day delay occurred at a critical time in the first degree murder trial when defendant was under cross-examination. A considerable time break in the midst of defendant's testimony could prejudice the jury's verdict. In the instant case the sequestered jury could only speculate as to the reasons for the substantial delay.
This court denied the state's writ request, recognizing that the application lacked merit. A recess should not have been granted by the trial judge on his own motion since the possibility of prejudice clearly outweighed the merits of the state's claims. However, the defendant failed to make a timely objection to the judge's action. An accused's right to have a particular trial action reviewed on appeal may be waived by the failure of his counsel to object to it at the time made:
"... the failure of an accused's counsel to make such objection or to file such motions will ordinarily constitute an intelligent waiver of the right to appellate review of such types of errors and the evidence upon which they are based...." State v. Spain, 329 So.2d 178, 179 (La. 1976).
By failing to seek corrective measures or to make a timely objection, defendant waived his right to contest the granting of the four and one-half day recess. C.Cr.P. 841; State v. Clark, 332 So.2d 236 (La.1976); State v. Marcell, 320 So.2d 195 (La.1975).
This assignment lacks merit.
Assignment of Error No. 30
By this assignment defendant contends that the trial court erred in requiring the defense to submit assignments of error before the trial transcript was prepared.
Defendant asserts that the court reporters were granted extensions of time in which to file the transcript of the trial, although defense counsel was denied an extension of time in which to file assignments of error. The result, defendant states, is assignments of error that are not as precise or as accurate as they should be.
Defendant was not without a remedy in ensuring that his assignments of error were precise or accurate. He had the option of either refining the assignments of error through his brief or of applying for writs to this court to be allowed to file supplemental assignments of error. Upon a showing of prejudice to the appeal, this court permits supplemental assignments of error. Defendant failed to avail himself of the remedies available to him. Moreover, he does not make a showing of specific prejudice resulting from the trial court's ruling.
This assignment lacks merit.
Assignment of Error No. 31
By this assignment defendant requests that this court review any and all errors patent on the face of the record. We found no errors that would warrant a reversal of defendant's conviction.
For these reasons, defendant's conviction and sentence are affirmed.
LEMMON, J., concurs.
WATSON, Justice, dissenting from denial of rehearing.
The defense contends that specific intent to kill or inflict great bodily harm on more than one person was not proved. The opinion relies, in part, on questionable facts to reject the defense argument. Particularly, the opinion states that blood on the front of the truck matched that of the victims. The blood was not matched with the victims'. (See testimony of Stephen Kirby, Jefferson Parish Crime Lab.)
*139 This case is based on circumstantial evidence, and all reasonable hypotheses of innocence must be negated.
The facts appear as compatible with negligent homicide as first degree murder, especially as to Dufrene. The record, while somewhat sketchy as to defendant's implication in Odom's death, is almost entirely silent as to the circumstances of Dufrene's; about the only indication is that Dufrene was hit by the pickup truck, which certainly falls far short of proving an intentional killing, beyond a reasonable doubt. The facts should be re-examined.
Also, there is a substantial issue under Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed. 2 and 639 (1980) concerning defendant's warrantless arrest.
For these reasons, a rehearing should be granted.
NOTES
[*] Judges Charles R. Ward, William H. Byrnes, III and David R. M. Williams of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice Dixon and Associate Justices Marcus, Blanche and Lemmon.
[1] Assignments of Error Nos. 4, 5, 8, 23 and 26 were specifically abandoned and waived in brief by defense counsel.
[2] "When the court grants the relief sought by the defendant under Article 719 it shall, upon the motion of the state, condition its order by requiring that the defendant permit or authorize the state to inspect and copy, photograph or otherwise reproduce any results of reports, or copies thereof, of physical and mental examinations and of scientific tests or experiments, of a similar nature, made in connection with the case, that are in the possession, custody, or control of the defendant, and that the defendant intends to use as evidence at the trial or were prepared by a witness whom the defendant intends to call at the trial when such results or reports relate to his testimony." C.Cr.P. 725.
[3] "Except as to scientific or medical reports, this Chapter does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant or his attorneys or agents in connection with the investigation or defense of the case; or of statements made by the defendant, or by witnesses or prospective witnesses to the defendant, his agents or attorneys; or of the names of defense witnesses or prospective defense witnesses." C.Cr.P. 728.
[4] Chain of custody or identification objections were lodged against the following items of evidence: S-38, black blouse; S-39, tan slacks; S-40-41, pair of brown boots, all identified by Ted Stevens, technician assigned to the crime scene; S-42-43, known hair samples identified by Stevens and Steve Kirby, a Jefferson Parish crime lab person; S-51-53, blood-like samples identified by Stevens and Kirby; S-54, lug wrench identified by Stevens; S-55, piece of pipe identified by Stevens; S-56, GMC label identified by Stevens; S-57, plastic grill identified by Stevens; S-58, navy blue cap; S-59, gray shoe; S-60, light tan men's slacks; S-61, plaid men's shirt, all identified by Stevens; 70-79, photographs of exhibits, identified by Ronald Singer, Director of Jefferson Parish Sheriff's Office Crime Lab; S-80-82, paint scrapings identified by Singer; S-83, S-87, debris scrapings from exhibits identified by Singer; S-88, gray plastic fragments identified by Singer.
[5] However, Reno's written statement shortly after the incident recounts the utterance as: "If you don't come on and go, I will knock the hell out of you."