DOUCET, Judge.
Defendant, Ray Anthony Sampay, was indicted by a grand jury for first degree murder. By unanimous vote, a jury of twelve found defendant guilty as charged. The result of the sentencing phase of trial was the jury’s recommendation of life imprisonment. On appeal, defendant alleges three assignments of error. However, assignment of error number three was not briefed, therefore, it is considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982); State v. Johnson, 438 So.2d 1295 (La.App. 3rd Cir.1983).
FACTS:
The victim, Patrick Boutte, Sr., was last seen alive on May 1, 1986, in the company of defendant and defendant’s half-brother, Jeffery White. When the victim failed to show up to drive his brother’s school bus route on the morning of May 1, 1986, the victim’s brother became concerned and attempted to contact the victim by phone and by visiting the victim’s residence. Unsuccessful in his attempt to locate the victim, the victim’s brother notified the police that the victim was missing.
Defendant was suspected of being involved in an automobile accident on May 2, 1986. As a result of his involvement in the accident, defendant was suspected of being involved in the disappearance of the victim. Defendant was placed under arrest for hit and run and taken to the station for questioning. Subsequent to giving a statement regarding the disappearance of the victim, defendant assisted the police in locating the body of the victim. Defendant was then indicted by the Iberia Parish Grand Jury for first degree murder.
ASSIGNMENT OF ERROR NUMBER 1:
Defendant’s first assignment of error alleges the trial judge erred in allowing the introduction of the State’s Exhibits Nos. 1, 17 and 18 as the prejudicial effect outweighed their probative value. With respect to State’s Exhibit No. 1, defendant’s contention is without merit because the exhibit was admitted into evidence without objection. La.C.Cr.P. art. 841 provides, in pertinent part, “An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”
In State v. Clement, 368 So.2d 1037 (La. 1979), the court stated:
“... our review of the record reveals that no objection was made by defense counsel contemporaneously with the questioning now assigned as error. La. Code Crim.P. art. 841 provides, and this court has consistently held, that an irregularity or error in the proceedings cannot be availed of after verdict unless it is objected to at the time of its occurrence. ... Hence, this issue is not properly before us.”
State v. Segura, 464 So.2d 1116 (La.App. 3rd Cir.1985) writ denied, 468 So.2d 1203 (La.1985), also stands for the proposition that absent a contemporaneous objection, *386 irregularities cannot be complained of on appeal.
State’s Exhibit 17 depicts the victim’s hands which are tied with wire and the victim’s chest which was crushed apparently by the wheels of a car. The victim’s feet bound by wire are depicted in State’s Exhibit 18. “Photographs of the victim’s body are generally relevant to prove corpus delicti; to corroborate other evidence of the manner in which death occurred; to establish the location, severity and number of wounds; to establish the identity of the victim.” State v. Edwards, 406 So.2d 1331 (La.1981); cert. den. 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). If the probative value of the photograph outweighs its inflammatory or prejudicial effect, the photograph is admissible. State v. Huntley, 418 So.2d 538 (La.1982); dissenting opinion, 425 So.2d 766 (La.1983); cert. den. 459 U.S. 1112, 103 S.Ct. 744, 74 L.Ed.2d 964 (1983). “A trial court’s ruling with respect to the admissibility of allegedly gruesome photographs will only be disturbed if the prejudicial effect of the photographs clearly outweighs their probative value.” State v. Tonubbee, 420 So.2d 126 (La.1982), cert. den. 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); reh. den. 462 U.S. 1146, 103 S.Ct. 3132, 77 L.Ed.2d 1381 (1983).
State’s Exhibit No. 17, which depicts the victim’s bound hands and his chest, is probative to prove cause of death and corpus delicti. The photograph is probative to prove cause of death because the defendant stated the victim was run over three times with his car, the doctor testified the trauma to the chest could have been inflicted by the tires of a car, and the doctor stated the primary cause of death was the rupture of the heart when the chest was crushed.
State’s Exhibit No. 18 as well as State’s Exhibit No. 17 are probative to corroborate other evidence of the manner in which death occurred. In arguing at trial for the admissibility of the photographs, the state contended the photographs depicting the bound hands and feet of the victim were relevant to prove he “was murdered because he was tied and helpless in that position when the killing took place.” In other words, the photographs of the victim’s bound hands and feet corroborate that he was murdered.
The photographs should not even be classified as gruesome. Even if they were considered gruesome it cannot be said that the prejudicial effect clearly outweighs their probative value. Therefore, the trial judge’s ruling should not be disturbed on appeal and this assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER 2:
Defendant contends the evidence presented at trial is insufficient to support the jury’s verdict of guilty of first degree murder. The standard of review applicable to sufficiency questions is whether the evidence, viewed in a light most favorable to the prosecution, reasonably supports the verdict. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The majority of the evidence relating to the sequence of events beginning on April 30,1986, and resulting in the victim’s death was provided by the defendant’s statement to police. On April 30,1986, defendant and Jeffery White rode with Ronald Jackson and Beverly Clay to the Checkmate Lounge where a crawfish boil was being held. While at the lounge, defendant and Jeffery White saw Patrick Boutte and began talking with him. The three, defendant, Jeffery, and Patrick, left the lounge, visited a convenience store, and purchased some liquor.
After consuming the liquor while parked in the lot of the convenience store, Jeffery made the suggestion that the three go to Patrick’s house. Defendant was accustomed to spending the night with Patrick as he had slept with him often, however, defendant did not want Jeffery to accompany them to Patrick’s. Instead of going to Patrick’s, the three returned to the same convenience store about 12:30 a.m. in Patrick’s car and purchased more liquor. Apparently against Patrick’s and defendant’s wishes, Jeffery accompanied them to Patrick’s house.
Initially, the three watched pornographic movies without incident. According to de *387 fendant, Jeffery then stated he was going to kill Patrick and pulled out a knife. Defendant struggled with Jeffery in an attempt to gain possession of the knife, however, was knocked unconscious for a short time as a result of his head striking a chair. Apparently after regaining consciousness, defendant entered Patrick’s bedroom to discover Jeffery “playing with” Patrick’s penis. Defendant also noticed Jeffery was trying to “jug” Patrick with the knife and defendant attempted to stop Jeffery. However, defendant was unsuccessful and Jeffery “jugged” Patrick in the neck twice.
Jeffery then led Patrick and defendant outside where he asked Patrick how much money he had. Patrick said Jeffery could have the thousand dollars underneath his mattress. The three returned to the bedroom to retrieve the thousand dollars. When Jeffery lifted the mattress, he found only fifty dollars, not the promised one thousand dollars. Displeased with the amount of money, Jeffery threatened to kill both Patrick and defendant.
Mrs. Judy Ann Hill, a neighbor of the victim at the time of his death, testified regarding what she observed at the victim’s trailer in the early morning hours on May 1, 1986. At approximately three o’clock a.m. on the morning of May 1, Mrs. Hill was awakened as her husband had just returned home. Her attention was called to the victim’s trailer by the sound of voices from that direction. When she looked out her bathroom window, she observed three men in the victim’s yard. Although she was unable to recognize the victim from his facial features, Mrs. Hill recognized the victim as one of the three men by his height, build and voice.
Mrs. Hill did not recognize either of the two other men but did describe one as being a little taller than the victim, and the other being taller than both the victim and the other man. Through testimony of other persons, it was established that defendant was taller than Jeffery White, and Jeffery weighed approximately 125 pounds.
Mrs. Hill described the position of the three men as Patrick being in the middle, the shorter of the other two being in front of Patrick, and the taller of the other two being in back of Patrick. She heard Patrick say he did not have anything in his hand and noted Patrick sounded angry. The tallest of the three, defendant, had his hand on the victim’s arm. After walking back into the victim’s trailer and remaining there for a short time, the three men walked back out into the yard. The position of the three men remained the same and defendant was still holding onto the victim’s arm. The defendant then turned the victim around and the three again went back inside the trailer. When the three came out of the trailer this final time, they headed toward the victim’s garage where his Cadillac was parked. As Mrs. Hill could no longer see the three men as they approached the garage, she no longer watched them.
While there was no real show of force or violence by defendant toward the victim during the time Mrs. Hill observed the three men, her account of the events is incompatible with the defendant’s theory that he and the victim were being threatened by Jeffery White. The defendant was “holding” the victim’s arm throughout the sequence of events. Additionally, the defendant turned the victim around just prior to the three entering the trailer for a second time. Again, Mrs. Hill’s account of the events is more compatible with the theory that defendant was exerting the force rather than being forced himself.
Returning to defendant’s version of the facts, defendant indicated Jeffery, after threatening to kill him and the victim, tied him and the victim up with an extension cord, made Patrick sit in the middle of the front seat and defendant in the passenger side of the front seat, and drove them in Patrick’s Cadillac to Kilgore Road. When they arrived at Kilgore Road, Jeffery hit Patrick in the head with a hatchet several times. In an attempt to escape, Patrick and defendant ran and hid in a ditch. Realizing they had been spotted, Patrick and defendant started to get out of the ditch when Jeffery again beat Patrick in the head with the hatchet. Describing Jeffery’s attack upon his person, defendant *388 stated, and he hit me one time like, you know he just tapped me.” Jeffery’s brutal attack upon Patrick with a hatchet and his mere “tapping” of defendant once is inconsistent with defendant’s contention that Jeffery was threatening to kill both defendant and Patrick. According to defendant, Jeffery then ran over Patrick with Patrick’s car three times. Defendant asserts he twice tried to pull Patrick out of the vehicle’s path but was unsuccessful due to the car’s speed.
With respect to the sequence of events following Jeffery’s running over Patrick, defendant, in the same statement, gave two different accounts. In the first account, defendant stated Jeffery tied up both him and Patrick and put them in the trunk. Jeffery then drove to Beaumont, dropped off defendant who was still tied up, on some street and then returned later for him in a Camaro. Apparently, defendant was not with Jeffery when Patrick’s body was disposed of as he did not know where the body had been dumped.
Upon further questioning, defendant appears to change his story. In the second account, defendant was in the trunk when Patrick’s body was disposed of by Jeffery. As it was dark and defendant remained in the trunk, he was unable to see where Patrick’s body was dumped. Although he could not see the location where Jeffery dumped the body as he was in the trunk, defendant stated he had a feeling he knew where Patrick’s body was located. In fact, although defendant was in the trunk with Patrick, he was still able to give a detailed description of the route Jeffery took to get to the spot where Patrick’s body was dumped.
Defendant and Jeffery then unsuccessfully attempted to get a new license for Patrick Boutte but with Jeffery’s picture on it. Jeffery again threatened to kill defendant and tied him to the door of the car so that he could not get free. According to defendant he was again threatened by Jeffery but this time with a twenty-five semiautomatic gun. In Texas, Jeffery traded Patrick’s Cadillac for a Camaro and $505 cash. After consummating the car deal, they returned to Franklin, La. where Jeffery graciously allowed defendant, whom he had been threatening to kill, to use the Camaro. Defendant contends Jeffery allowed him to use the car so that he would become a suspect in the disappearance of Patrick.
Defendant’s contention that Jeffery was continually threatening him and Patrick does not seem plausible given the size of the individuals. Although Jeffery was a little taller than the victim, he was shorter than defendant. Also, Jeffery weighed only 125 pounds. It is difficult to believe Jeffery, given his physical build, threatened two men — one of whom was taller and larger than he. In other words, defendant’s story that he was threatened is less plausible than the theory that he acted in concert with Jeffery in threatening Patrick.
Turning to the evidence adduced from the testimony of other persons, Captain Davis of the Iberia Parish Sheriff’s Office, testified as follows regarding the discovery of the victim’s body. Defendant, after leading the authorities to the spot on Kil-gore Road where the murder occurred, led police to a little side road right next to the Bayou Blue Bridge. After parking the cars, the search party, led by defendant, exited the vehicles. The party walked on foot about 150 yards from the parked vehicles and defendant turned to the side and stated there is the body. Using the Captain’s own words, defendant “simply walked down the road, stopped and said, there’s the body.”
Completely contradicting Captain Davis’s version of how the body was discovered, Detective Cossey of the Franklin Police Department testified he, not defendant, discovered the body. According to Det. Cos-sey, defendant led the group to a small, secluded levee road south of Lydia. Unsure of the stability of the levee road, the vehicles were parked some 25 to 30 yards from the highway. Approximately 200 yards from the road, the body was quickly discovered by Det. Cossey. Whether the victim’s body was discovered by Det. Cos-sey or defendant was for the jury to decide, as the assessment of the witnesses’ credibility lies within the sound discretion of the trier of fact. State v. Klar, 400 So.2d 610 (La.1981). If defendant did lead the au *389 thorities directly to the body as Captain Davis testified, doubt would certainly be cast on defendant’s contention that he was tied up in the trunk and did not see where Jeffery dumped the body.
In defendant’s statement he indicated Jeffery tied up both he and Patrick before they left for Kilgore Road. However, he does not indicate how long he was tied up or at what point Jeffery untied him. Patrick was tied up by Jeffery before they left for Kilgore Road and remained that way until his body was discovered. Dr. Emil Laga, the physician performing the autopsy on the victim’s body, testified the wires were wound tightly around the victim’s hands and feet. The wire was wound around the wrists so tight that it caused imprints and hemorrhaging. The presence of hemorrhaging on the wrists indicates the wires were applied when the victim was still alive. While defendant contends Jeffery tied him up, Capt. Davis testified he checked defendant’s wrist and saw no evidence such as imprints, markings or hemorrhaging of his hands being bound by wire.
James A. Holley of Holley’s Car Lot in Houston, Texas, testified regarding the transaction by which Jeffery and defendant traded Patrick’s Cadillac for a Camaro and $505 cash. On May 1, 1986, about 11 a.m., Jeffery and defendant went to Holley’s Car Lot to trade Patrick’s Cadillac. Jeffery indicated that he was Patrick Boutte. When identification was requested, Jeffery told Mr. Holley and Mr. Chipman that he must have left his driver’s license at home. Defendant remarked that Jeffery should have brought his license with him. The two left pretending that they were going to Jeffery’s house to retrieve his license.
About one o’clock in the afternoon, the two returned to Holley’s and Jeffery presented Patrick’s license but the license had been altered so that it was difficult to discern the picture. Jeffery presented other items of identification such as a pre-printed bank deposit slip with Patrick’s name, Patrick’s checkbook, and an application in Patrick’s name for a Texas driver’s license. Defendant did not participate in the negotiations and simply sat in silence. As a result of the deal, the Cadillac belonged to Holley’s and Jeffery and defendant drove away in a Camaro and $505 cash in hand. All personal items in the Cadillac were transferred to the Camaro by Jeffery and defendant. Mr. Holley brought the Cadillac to an inspection station to obtain a green slip and while the inspection was being conducted, he noticed what appeared to be blood stains on the rear seat. Suspecting foul play, Mr. Holley notified the homicide department of the Houston Police.
As previously noted, defendant indicated Jeffery allowed him the use of the Camaro when they reached Franklin, Louisiana. Following his arrest, the car was impounded and the trunk searched. A hammer and a vacuum cleaner were found in the trunk. The plug-in extension cord of the vacuum cleaner had been cut off. An attempt was made to get fingerprints from the hammer however, it was unsuccessful.
In conclusion, while defendant continually denied that he killed the victim, there are some inconsistencies within his statements, and portions of his statement are not plausible. Obviously, the jury chose not to believe defendant’s assertion that he did not kill the victim. Given the evidence, it cannot be said the jury was unreasonable in reaching the verdict. Therefore, this assignment of error lacks merit.
Accordingly, for the foregoing reasons, the conviction and sentence of the lower court is affirmed.
AFFIRMED.